# UNITED TATES ISTRICT OURT

for the

District of Columbia ▼

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH Danny@trustify.co<br>and Danny.Boice@gmail.com THAT IS STORED AT<br>PREMISED CONTROLLED BY GOOGLE LLC | )<br>)<br>)   Case No.<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state unde penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. s. 78j(b), 78ff | Securities Fraud |
| 18 U.S.C. s. 1014 | False Statements to a Financial Institution |
| 18 U.S.C. s. 1001 | False Statements to a Government Agency |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Jeffrey Weeks
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____02/15/2019_____

_____
*Judge's signature*

City and state: Washington, D.C.

Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia ▼

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. |
| INFORMATION ASSOCIATED WITH Danny@trustify.co | ) |
| and Danny.Boice@gmail.com THAT IS STORED AT | ) |
| PREMISES CONTROLLED BY GOOGLE LLC | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 1, 2019 _____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ United States Magistrate Judge G. Michael Harvey _____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:    02/15/2019 3:00 pm _____

_____
*Judge's signature*

City and state:      Washington D.C. _____      United States Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

This warrant applies to information associated with: Danny@trustify.co and Danny.Boice@gmail.com that is stored at premises controlled by Google LLC ("Google"), a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA, 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Provider, regardless of whether such information is located within or

outside of the United States, and including any emails, records, files, logs, or information that

has been deleted but is still available to the Provider, or has been preserved pursuant to requests

made under 18 U.S.C. § 2703(f): i) for Target Account 1 on October 24, 2018 and February 13,

2019, and ii) for Target Account 2 on February 6, 2018, the Provider is required to disclose the

following information to the government for each account or identifier listed in Attachment A:

1.      The contents of all emails associated with the account **from October 1, 2015**

**through the Present**, including stored or preserved copies of emails sent to and from the

account, draft emails, the source and destination addresses associated with each email, the date

and time at which each email was sent, and the size and length of each email;

2.      All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP

address used to register the account, log-in IP addresses associated with session times and dates,

account status, alternative email addresses provided during registration, methods of connecting,

log files, and means and source of payment (including any credit or bank account number);

3.      The types of service utilized;

4.      All records or other information stored by an individual using the account,

including address books, contact and buddy lists, calendar data, pictures, and files; and

5.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 15 U.S.C. § 78j(b) and 17 CFR § 240.10b-5 (securities fraud), 18 U.S.C. § 1014 (false statements to a federally insured financial institution), and 18 U.S.C. § 1001 (false statements to a government agency), those violations involving Daniel Boice and occurring after **October 1, 2015**, including, for each account or identifier listed on Attachment A, information relating to the following matters:

(a) Trustify's investors, including: i) statements made to investors and/or potential investors in Trustify, including any false statements and any statements made regarding Trustify's performance and Boice's compensation; and ii) the identities of Trustify's investors (including names, addresses, phone numbers, e-mail addresses, or any other identifying information);

(b) Boice's compensation from Trustify, including but not limited to his salary, his ownership interest in Trustify, Trustify's reimbursement of his expenses, and Trustify's payments to Boice based on a percentage of Trustify's gross sales;

(c) Trustify's financial performance, including its actual and projected revenues, expenses, and profits;

(d) Trustify's customers, including the identities of its individual and corporate customers (including names, addresses, phone numbers, e-mail addresses, or any other identifying information);

(e) The private investigators in Trustify's network, including information regarding the number and dollar value of investigations completed, and the identities of past

or present investigators (including names, addresses, phone numbers, e-mail addresses, or any other identifying information);

(f) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

### III.    Government procedures for warrant execution

The United States will conduct a search of the information produced by Google and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Google that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH Danny@trustify.co and Danny.Boice@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR SEARCH WARRANT**

I, Jeffrey Weeks, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with certain accounts that is stored at premises controlled by Google LLC

("Google") an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View,

CA 94043.  The information to be searched is described in the following paragraphs and in

Attachment A.  This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the

government copies of the information (including the content of communications) further

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been since April 2005.  I am currently assigned to a complex financial crimes squad at the

Washington Field Office of the FBI in Manassas, Virginia.  My involvement in this investigation

has included interviewing witnesses, reviewing financial and other records provided by

numerous financial institutions and other entities, and reviewing reports of interviews prepared by Virginia State Corporation Commission ("SCC") investigators.

3.       This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 15 U.S.C. § 78j(b), § 78ff, and 17 CFR § 240.10b-5 (securities fraud); 18 U.S.C. § 1014 (false statements to a federally insured financial institution); and 18 U.S.C. § 1001 (false statements to a government agency); have been committed by Daniel Boice ("Boice").  There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

5.       Boice is a resident of Virginia, and was formerly a resident of Washington, D.C. Boice is the CEO and co-founder of Trustify, Inc. ("Trustify"), which he founded as a Delaware corporation with its principal place of business in Washington, D.C. in or about 2015.  As set forth in more detail below, our investigation has revealed evidence that Boice: a) has participated in a scheme to defraud a potential investor in Trustify; b) made false statements to a federally insured financial institution in an attempt to refinance a mortgage loan; and c) made false statements to the Securities and Exchange Commission ("SEC"), and that additional evidence of these crimes will be found on Boice's e-mail accounts **Danny@trustify.co** ("Target Account 1") and **Danny.Boice@gmail.com** ("Target Account 2").

## JURISDICTION

6.       This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction

over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below,

acts or omissions in furtherance of the offenses under investigation occurred within Washington,

D.C.  See 18 U.S.C. § 3237.  Finally, the offenses under investigation are the subject of a grand

jury investigation in the District of Columbia.

## PROBABLE CAUSE

7.      According to a Trustify filing with the SEC, Boice founded Trustify in or about

2015 as a Delaware corporation with its principal place of business in Washington, D.C.  Based

on a filing with the Virginia State Corporation Commission, Trustify moved its principal office

to Arlington, Virginia, and registered with the state of Virginia in April 2017.  Trustify provides

an electronic platform to connect private investigators with customers.  According to statements

made by Boice and Trustify documents, Trustify is not profitable, so in addition to its revenues it

raises money from investors to fund its operations.

**I.      Boice's False Representations to Investor A**

8.      In January 2019, during the course of the FBI's investigation of this matter, Boice

made what appeared to be material false statements to Investor A in an attempt to persuade

Investor A to invest in Trustify.  On December 7, 2018 and January 15, 2019, Boice (using

Target Account 1[1]) e-mailed Investor A to determine if Investor A was interested in investing in

Trustify.[2]  Investor A initially responded on January 15, 2019 that he was not planning on

---

[1] Boice used Target Account 1 for his e-mail communications with Investor A described in this affidavit.

[2] Investor A has never invested in Trustify.

making any new investments until March 2019.  Thereafter, at the direction and supervision of

the FBI, Investor A reached out to Boice in an e-mail on January 30, 2019.  He stated that

Trustify "[l]ooks pretty compelling," and asked to schedule a call with Boice to discuss an

investment in Trustify in more detail.  In response, Boice e-mailed Investor A to set up a call on

January 31, 2019, and stated that he still had "$2.5M" – in other words, an opportunity for a $2.5

million investment in Trustify stock.[3]

9.      The morning of the January 31, 2019 call, Boice provided Investor A with

approximately twenty-five purported Trustify documents.  These documents contained detailed

representations regarding Trustify, including its 2018 revenues, its number of current employees,

the number of private investigators in Trustify's network, and Boice's compensation.  Then on

the January 31, 2019 phone call and on additional calls with Investor A on February 1, 2019 and

February 8, 2019,[4] Boice confirmed many of these representations, and provided additional

information to Investor A.  The FBI's investigation has revealed evidence that a number of

Boice's representations were false.

**A.      Trustify's Revenues**

10.      With respect to Trustify's 2018 revenues, on January 31, 2019 Boice provided

Investor A a document which detailed Trustify's revenues for the first ten months of 2018, and

listed Trustify's estimated revenues for November 2018 and December 2018.  That document

---

[3] Trustify stock is not publicly traded, but it is a "security" as that term is used is 15 U.S.C. §
78j(b), which is defined in 15 U.S.C. § 78c.

[4] Investor A participated in these calls at the direction of the FBI.  The FBI also recorded the calls
with Investor A's consent.

represented that Trustify projected earning over $16 million in total revenue for 2018.  Then on the call with Investor A later that day, Boice confirmed that Trustify in fact had received over $16 million in revenue for 2018.  Information obtained from current and former Trustify employees indicate that certain of the revenue numbers represented by Boice, including the approximately $16 million total revenue figure, were significantly higher than Trustify's actual revenues.  As described in the following paragraphs, that total revenue number was based on monthly revenue figures that appear to be false.

11.     Former Trustify Employee A worked at Trustify from April 2017 until approximately February 1, 2019.  She stated in an interview with the FBI that as part of her job duties, she worked to sell Trustify services to businesses and corporate clients.  She estimated that until June or July of 2018, Trustify averaged approximately 20 business "cases" (*i.e.*, investigative assignments) per month, with an approximate average revenue of $1,200 per case.  Those figures would correspond with Trustify monthly revenues from business clients of approximately $24,000.  The document provided by Boice to Investor A, however, listed the monthly revenues from business clients from January 2018 through July 2018 as being much higher, ranging from approximately $465,000 to approximately $855,000.  Trustify Employee A also stated that Trustify had a large decline in new business cases in August 2018 or September 2018.  Despite this, the document provided by Boice to Investor A showed that Trustify's revenues from business customers increased from approximately $855,000 in July 2018, to approximately $914,000 in August 2018, to approximately $986,000 in September 2018.

12.     Former Trustify Employee B worked at Trustify from April 2017 until November 2018, first as an account manager providing services to retail customers, and then starting in January 2018 as a customer success manager providing services to both business and retail

5

customers.  He stated in an interview with the FBI that from April 2017 through December 2017, Trustify had approximately 100 retail customer "cases" per month.  Then starting in the spring and summer of 2018, Trustify's retail customer business began to decline, and he estimated that Trustify averaged approximately 20 to 40 retail customer investigative cases per month in 2018.

13.     Based on figures provided by Former Trustify Employee B for the number of hours billed and the billing rate for typical customer investigative cases, approximately sixty percent of the customer cases had a maximum average revenue of approximately $450 per case. The remaining forty percent of the customer cases had somewhat higher average revenue.  Even assuming that Trustify was able to average $1,000 in revenue per customer case, and charge for 40 customer investigative cases per month (the high end of the 2018 range provided by Former Trustify Employee B), Trustify would have averaged $40,000 in retail customer revenue per month in 2018.  The document provided by Boice to Investor A, however, listed the 2018 monthly revenues from retail customer clients as being much higher, ranging from approximately $346,000 to approximately $700,000.

**B**.      **Number of Trustify's Employees and Private Investigators**

14.     Regarding the number of Trustify's current employees and the number of private investigators in its network, Boice provided Investor A with a document which listed approximately 50 employees as working at Trustify.  Boice told Investor A on the January 31, 2019 call that Trustify had about 50 employees, and stated that Trustify may end up "almost doubling that" over the course of the next several years.  He provided Investor A an additional document which provided detailed, purported information on Trustify's private investigator network, including that Trustify had nearly 8,000 investigators in its network, approximately

6

2,500 of whom had a "case" in the last 30 days.  On the January 31, 2019 call, Boice confirmed

that Trustify had about 8,000 investigators in its network.

15.    These numbers again appear to be significantly higher than Trustify's actual

number of employees and private investigators.  Former Trustify Employee C stated in an

interview with the Virginia SCC that she worked at Trustify from July 2018 to October 2018.

She also stated in that interview, from talking to other Trustify employees, that Boice terminated

the employment of a number of Trustify employees in late November 2018, and that following

those terminations Trustify only had approximately ten to fifteen employees.  Similarly, Former

Trustify Employee A stated that a number of Trustify employees were terminated or quit

beginning in October 2018.  Former Trustify Employee A also stated that as of September 2018,

Trustify only had approximately 600 private investigators in its network, of whom approximately

60 had done work for Trustify – far fewer than the number represented by Boice to Investor A.

**C.    Boice's Compensation**

16.    Finally, with respect to Boice's compensation, Boice provided Investor A a

document which stated that Boice's compensation was $75,000 per year.  The document also

noted that Boice's "market" compensation was significantly higher, indicating that Boice was

taking a reduced salary to work at Trustify.  Similarly, on the February 1, 2019 call, Boice stated

to Investor A that he was taking the reduced salary, in part, because, "it's about the exit…we're

not doing this to make … some salary, it's more … we're going big."  Boice confirmed on the

February 1, 2019 call that his historical compensation at Trustify had been $75,000 per year.

17.    Boice's representations regarding his compensation are significantly contradicted

by: a) representations that Boice made to Bank A in 2016 in an attempt to refinance a mortgage

loan; and b) a review of certain of Trustify and Boice's financial records.  With respect to Bank

7

A, Boice communicated with Bank A in 2016 in an attempt to refinance a loan on his home.[5]  As

part of those communications, Boice provided Bank A with a Trustify employment agreement

dated January 1, 2016.  That agreement stated that Trustify would pay Boice $275,000 annually,

in addition to Trustify making daily payments to Boice and his wife (a co-founder of Trustify)

based on 10% of Trustify's gross sales.  In an August 19, 2016 e-mail from Boice (using Target

Account 2) to an employee of Bank A, Boice confirmed that under his Trustify employment

agreement he received a $275,000 base salary, in addition to "daily earn-out payments."

18.     A review of certain of Boice's financial records also significantly contradicts the

representations that Boice made to Investor A that he made $75,000 annually in compensation.

For example, those records indicate that between December 31, 2015 and July 31, 2018, Trustify

paid approximately $1.8 million into a bank account jointly held in the name of Boice and his

wife.[6]

### D.     Additional Investor Communications

19.     Finally, in addition to the representations that Boice made to Investor A, Former

Trustify Employee D stated in an interview with the Virginia SCC that during her employment at

_____

[5] Boice used Target Account 2 for his e-mail communications with Bank A referenced in this affidavit.

[6] The Trustify employment agreement referenced in paragraph 17 also stated that Trustify would pay Boice's wife $275,000 annually.  Assuming that figure is accurate and that Trustify made those payments into this bank account, taking Boice's wife's purported annual salary of $275,000 plus the $75,000 annual salary that Boice represented to Investor A would only amount to approximately $905,000 over this time period -- far less than the $1.8 million that Trustify paid into their bank account.

Trustify, which lasted from approximately May 2016 through June 2017, Boice and his wife

handled communications with Trustify investors.

## II.    False Statements to Financial Institution

20.    As stated above, Boice communicated with Bank A in part using Target Account

2.  As part of the FBI's investigation, it has uncovered evidence that Boice provided Bank A[7]

with false bank account statements in 2016 in support of his mortgage refinance application.[8]

21.    The FBI spoke with Former Trustify Employee D in February 2018.  As stated

above, she worked at Trustify from approximately May 2016 through June 2017, and she

provided a document that she discovered while working there.  The document appears to be a

September 23, 2016 fax message from Boice to one of the employees at Bank A with whom he

was communicating about his mortgage application using Target Account 2.  The fax includes a

purported one-page Trustify account statement from the Bank of Georgetown.  A representative

of United Bank, whose parent company acquired the Bank of Georgetown in 2016, confirmed to

a Virginia SCC investigator that from January 2010 through June 2018 (the date of United

Bank's response), it did not have an account in Trustify's name.  This indicates that the bank

statement Boice provided to Bank A was fraudulent.

22.    Additionally, Boice provided Bank A with bank account statements from Silicon

Valley Bank ("SVB") that appear to be falsified.  A review of SVB records obtained by the

Virginia SCC indicates that Trustify had a bank account with SVB ending in x9453.  Boice

provided Bank A with SVB bank account statements for May 2016 through July 2016 for that

---

[7] Bank A's accounts are insured by the Federal Deposit Insurance Corporation ("FDIC").

[8] The mortgage refinance application was made in the name of Boice and his wife.

9

same account number (x9453), but which appear to falsely list Boice and his wife as the account holders rather than Trustify.  As part of its investigation, the FBI has reviewed the SVB bank account records (x9453) for May 2016 through July 2016 obtained from SVB by the Virginia SCC.  The May 2016 and June 2016 statements that Boice provided to Bank A listed the same transactions and account balances as the actual Trustify statements obtained from SVB, but with Boice and his wife listed as the account holders rather than Trustify.  The July 2016 statement that Boice provided to Bank A also listed Boice and his wife as the account holders rather than Trustify, and additionally altered the account activity listed on the statement from the actual July 2016 Trustify statement obtained from SVB.

23.     Using Target Account 2, Boice also provided Bank A with representations regarding Trustify's financial performance.  For example, on August 19, 2016, he e-mailed Bank A that "[t]he company has raised $6M in venture capital funding to date since January 2015.  The company has nearly $5M of that cash in the bank as reserves.  This cash position represents over three years of cash runway conservatively.  It is likely more given that the company is on track to be profitable by the end of the year – which is incredibly fast for a relatively new technology company."  Based on other statements made by Boice and Trustify documents, Trustify was not profitable by the end of 2016 and is still not profitable.

**III.     False Statements Made to the SEC**

24.     Finally, the FBI's investigation has revealed evidence that Boice has made false statements to the SEC in connection with Trustify.  According to filings with the SEC, Trustify has conducted several capital raises from investors.  In a May 2016 filing, Trustify represented that it had sold approximately $1.9 million in Trustify shares.  That filing stated that Trustify first sold investments under that notice on October 30, 2015.  In a June 2017 filing, Trustify stated

10

that it had sold an additional, approximately $6.5 million in Trustify shares and planned to sell approximately $1.1 million more.  Finally, in an August 2018 filing, Trustify represented that it was offering an additional $20 million in Trustify shares, of which it had sold approximately $2.9 million.  Boice electronically signed each of those filings as Trustify's CEO.

25.      In each of these SEC filings, Trustify represented that it was not using any of the "gross proceeds" of the offerings for executive compensation, including for Boice.  As discussed above, a review of certain of Trustify's financial records indicate that Trustify paid a bank account in the name of Boice and his wife approximately $1.8 million over the time period January 2016 to July 2018.  During this same time period, statements made by Boice, interviews with current and former employees of Trustify, and a review of certain Trustify documents show that Trustify was not profitable -- indicating that Trustify was paying for its expenses, including executive compensation, with investor funds as well as with revenues earned from its operations.

26.      The FBI sent preservation requests under 18 U.S.C. § 2703(f) to Google for Target Account 1 on October 24, 2018 and February 13, 2019, and for Target Account 2 on February 6, 2019.  In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Google servers indefinitely.  Even if the subscriber deletes the e-mail, it may continue to be available on Google servers for a certain period of time.

## BACKGROUND CONCERNING E-MAIL

### Trustify Email Accounts Hosted by Google

27.      The investigation has revealed that e-mail accounts with Trustify's Internet website domain, "trustify.co" are hosted by a Google electronic mail exchange.  A February 13,

2019 query of open-source Domain Name System (DNS) records performed by the FBI on https://CentralOps.net/, a publicly available website, indicated that e-mails from the domain name "Trustify.co" are hosted by a Google electronic mail exchange. This indicates that Google hosts Target Account 1 (danny@trustify.co). Additionally, the FBI sent an e-mail preservation request under 18 U.S.C. § 2703(f) to Google for Target Account 1 on October 24, 2018, and a follow-up request on February 13, 2019. In my experience, when Google receives an e-mail preservation notice for an account which it does not host, Google responds to law enforcement that it does not have any such records. Here, Google did not provide such a response.

<u>Google Email Services</u>

28.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com (like Target Account 2). It also provides e-mail hosting services for e-mail addresses from other domain names (like Trustify.co) in exchange for a fee. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

29.     A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

30.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

31.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

32.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

33.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline

14

information may tend to either inculpate or exculpate the account owner.  Additionally,

information stored at the user's account may further indicate the geographic location of the

account user at a particular time (*e.g.*, location information integrated into an image or video sent

via email).  Last, stored electronic data may provide relevant insight into the email account

owner's state of mind as it relates to the offense under investigation. For example, information in

the email account may indicate the owner's motive and intent to commit a crime (*e.g.*,

communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications

in an effort to conceal them from law enforcement).

### **CONCLUSION**

34.     Based on the forgoing, I request that the Court issue the proposed search warrant.

Because the warrant will be served on Google, who will then compile the requested records at a

time convenient to it, reasonable cause exists to permit the execution of the requested warrant at

any time in the day or night.

Respectfully submitted,

_____
Jeffrey Weeks
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on February 15, 2019:

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

15